**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- X
**JEAN HILAIRE, JEAN FRESNEL, SUALIO KAMAGATE, JEAN VERTUS, FOUSSEIMI CAMARA, JEAN MOROSE, NOE PEREZ, EDGAR ESPINOZA, BOLIVIO CHAVEZ, BRAULIO MATAMORES FLORES, JEORGE VENTURA CONCEPCION, ANGEL SANDOVAL, CARLOS DE LEON CHIYAL, and LESLY PIERRE on behalf of themselves and all others similarly situated who were employed by Underwest West Side Operating,**

                               **Plaintiffs,**
                     **- against-**
**UNDERWEST WESTSIDE OPERATING CORP., MOSHE WINER, MARTIN TAUB, AVI GOLAN, AND ELAD EFORATI,**
                           **Defendants.**
-------------------------------------------------------------- X

               <u>Civil Action</u>

               **Case No.: 19-CV-3169**

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF CLASS CERTIFICATION**
**and FINAL APPROVAL OF CLASS AND COLLECTIVE SETTLEMENT**

Avi Mermelstein
Arenson, Dittmar & Karban
200 Park Avenue, Suite 1700
New York, New York 10166
Tel: (212) 490-3600
Fax: (212) 682-0278
www.adklawfirm.com
*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

I.      **INTRODUCTION** ……………………….…………………………………7

II.     **ARGUMENT**…………………….…………………………..……….9

        A. **THE COURT SHOULD CERTIFY THE CLASS FOR NYLL
        SETTLEMENT**………………….……………………………….9

        B. **FINAL APPROVAL FO THE SETTLEMENT IS APPROPRIATE
        BECAUSE THE SETTLEMENT IS FAIR, REASONABLE, AND
        ADEQUATE**……………………….…………………………….9

III.    **PLAINTIFFS' REQUESTS FOR SERVICE PAYMENTS ARE REASONABLE
        AND SHOULD BE APPROVED**………………………….……………….21

IV.     **PLAINTIFFS' REQUEST FOR ATTORNEY'S FEES AND COSTS IS
        REASONABLE AND SHOULD BE APPROVED**……………………………..25

V.      **THE COURT SHOULD APPROVE THE PAYMENT OF ADMINISTRATIVE
        COSTS FROM THE SETTLEMENT FUND**……………………………..……36

VI.     **CONCLUSION**……………………….………………………………36

## Table of Authorities

<u>Cases</u>

*Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81 (S.D.N.Y. 2001)……………… …….29

*Ballinger v. Advance Magazine Publrs., Inc.*, No. 13 CIV. 4036 HBP, 2014 WL 7495092 (S.D.N.Y. Dec. 29, 2014) …………………………………………………………………………12

*Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 743 (1981) …………………………….29

*Beckman v. KeyBank, N.A.*, 293 F.R.D. 467 (S.D.N.Y. 2013) ……………..…12, 20, 21, 28, 32, 34

*Bryant v. Potbelly Sandwich Works, LLC*, No. 117CV07638CMHBP, 2020 WL 563804 (S.D.N.Y. Feb. 4, 2020) ……………………………….…………………………………………32, 33

*Cagan v. Anchor Sav. Bank FSB*, No. 88 Civ. 3024, 1990 WL 73423 (E.D.N.Y. May 22, 1990)...15

*Capsolas v. Pasta Resources Inc.*, 2012 WL 4760910 (S.D.N.Y. Oct. 5, 2012) …………….….…18

*Clark v. Ecolab Inc.*, 2010 WL 1948198, at *9 (S.D.N.Y. May 11, 2010) ………………….…35

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974)….9 – 12, 14 – 15, 17 – 20, 29 - 30

*Clark*, 2009 WL 6615729 (S.D.N.Y. Nov. 27, 2009)……………….……………..……….…...18

*DeLeon v. Wells Fargo Bank, N.A.*, 2015 WL 2255394 (S.D.N.Y. May 11, 2015) …………..….22

*Dominguez v. Galaxy Recycling Inc.*, No. CV 12-7521 (LDW), 2017 WL 2495406 (D.N.J. June 9, 2017) ………………………….……………………….………………….…………………14

*Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 239-240 (E.D.N.Y. 2010)…….11, 26, 33

*Frank v. Eastman Kodak Co.*, 228 F.R.D. 174 (W.D.N.Y. 2005)……………..…15, 21, 23 – 25, 30

*Gilliam v. Addicts Rehab. Ctr. Fund*, 2008 WL 782596 (S.D.N.Y. Mar. 24, 2008)…………..….10

*Goldberger v. Integrated Res.*, 209 F.3d 43, 50 (2d Cir. 2000)…………………………….26, 29, 34

*Gutierrez v. Tryax Realty Mgmt., Inc.*, 2020 WL 777190 (S.D.N.Y. Feb. 18, 2020)…………….32

*Henry v. Little Mint, Inc.*, No. 12 CIV. 3996 CM, 2014 WL 2199427 (S.D.N.Y. May 23, 2014)..9

*In re American Int'l. Grp. Inc. Sec. Litig.*, 2012 WL 345509 (S.D.N.Y. Feb. 2, 2012) )……..…22

*In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000), *aff'd sub. nom. D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001)… )…………..…10, 12 – 13, 15

*In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d at 351)……………..……………..…30

*In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 467 (S.D.N.Y. 2004) )……………32

*In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 692 (S.D.N.Y. 2019)…..……………17

*In re Indep. Energy Holdings Pub. Ltd. Co. Sec. Litig.*, 302 F. Supp. 2d 180, 183 n.3 (S.D.N.Y. 2003) …………….…………….…………….…………….…………….………………………35

*In re Ira Haupt & Co.*, 304 F. Supp. 917, 934 (S.D.N.Y. 1969) ………….………………13

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2018 WL 3863445, at *2 (S.D.N.Y. Aug. 14, 2018) …………….…………….…………….…………….………………….……………..…….21, 35

*In Re Med. X-ray Film Antitrust Litig*, 1997 WL 33320580, at *6 (E.D.N.Y. Dec. 26, 1997)….18

*In re Painewebber Ltd. P'ships Litig.,* 171 F.R.D. 104, 126 (S.D.N.Y. 1997) ………………13

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 29 (E.D.N.Y. 2019) …………….…………….…………….…………….…………….………………….…...17

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537 (3d Cir. 2004) ……………..……..11

*Johnson v. Brennan*, 2011 WL 4357376, at *19 (S.D.N.Y. Sept. 16, 2011) ……………………33

*Knapp v. Badger Techs., Inc.*, 2015 WL 3745303, at *6 (W.D.N.Y. June 15, 2015) …………..33

*Lizondro-Garcia v. Kefi LLC*, 300 F.R.D. 169, 173, 180 (S.D.N.Y. 2014) …………15, 18-19, 21

*Lora v. To-Rise, LLC*, No. 16-CV-3604-SJB, 2020 WL 8921400 (E.D.N.Y. June 3, 2020)… …………….…………….…………….…………….………………….………………….…………15, 25, 31, 33

*Maley v. Del Global Techs. Corp.,* 186 F. Supp. 2d 358, 362-63 (S.D.N.Y. 2002) …………11, 14

*Manley v. Midan Rest. Inc.*, No. 14 CIV. 1693 (HBP), 2016 WL 1274577 (S.D.N.Y. Mar. 30, 2016) …………….…………….…………….…………….…………….………………….……………..…16

*Mirabal v. Caribbean Car Wash, Inc*. No. 19-cv-16608-MCA-ESK (D.N.J. May 24, 2021)……32

*Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 618 (S.D.N.Y. 2012) ………………18

*Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 628 (9th Cir. 1982) ………………....15

*Parker v. Jekyll & Hyde Ent. Holdings, L.L.C.*, 2010 WL 532960 (S.D.N.Y. Feb. 9, 2010)…22-25

*Taft v. Ackermans*, 2007 WL 414493, at *10 (S.D.N.Y. Jan. 31, 2007). ………….……….…31

*Ray*, 2020 WL 5796203 (S.D.N.Y. Sept. 29, 2020) ………………………….………………18

*Sandoval, et al. v. Galaxy General Contracting Corp., et al.*, No. 10-CV-5771 (PGG)(S.D.N.Y. 2013) …………………………….………………….…………………….………………………32

*Sawadogo v. Zap Lube & Car Wash, Inc.*, No. CV 20-1196(SDW)(LDW), 2020 WL 6689826 (D.N.J. Nov. 13, 2020) …………………………………………………….……………….…31

*Sewell v. Bovis Lend Lease, Inc.*, No. 09 CIV. 6548 RLE, 2012 WL 1320124 (S.D.N.Y. Apr. 16, 2012) ……………………………………………………………………….……………12, 23 – 25

*Silver*, 2013 WL 208918, at *1 (S.D.N.Y. Jan. 4, 2013) ………….……………………………18

*Slomovics v. All for a Dollar*, 906 F. Supp. 146, 150 (E.D.N.Y. 1995)…………….……………11

*Sukhnandan v. Royal Health Care of Long Island LLC*, No. 12CV4216 RLE, 2014 WL 3778173 (S.D.N.Y. July 31, 2014) ………….……….……………….……………….…………….…...29

*Tiro v. Pub. House Invs., LLC*, No. 11 CIV. 7679 CM, 2013 WL 4830949, at *13 (S.D.N.Y. Sept. 10, 2013) ………….……….……………….……………….………….………………………28, 32, 34

*Velez v. Majik Cleaning Serv.*, 2007 WL 7232783, at *7 (S.D.N.Y June 25, 2007) …………22-23

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 119 (2d Cir. 2005). ……………11, 26, 34

*Wolinsky v. Scholastic Inc.,* 900 F.Supp.2d 332, 335 (S.D.N.Y.2012) ……………………….20-21

Federal Rules and Statutes

29 U.S.C. § 216(b) …………………………………………………….……………….7, 20, 26, 29

Fed. R. Civ. P. 23………………………….…………………………………9, 16 – 17, 20 – 21, 29

Secondary Sources

*See* Theodore Eisenberg et al., *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. Rev. 937,                                     952                                     (2017) ………………….……………………….…………………….…………………………33

William B. Rubenstein, Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*, (5th ed. 2011) ……………………………………………………………………………………17

**INTRODUCTION**

Plaintiffs Jean Hilaire, Jean Fresnel, Sualio Kamagate, Jean Vertus, Fousseimi Camara, Jean Morose, Noe Perez, Edgar Espinoza, Bolivio Chavez, Braulio Matamores Flores, Jeorge Ventura Concepcion, Angel Sandoval, Carlos De Leon Chiyal, and Lesly Pierre (collectively, "Plaintiffs"), are former, non-managerial employees at Westside Highway Car Wash, formerly located at 638 West 46th Street, New York, NY 10036.   On behalf of themselves and others similarly situated, Plaintiffs brought this wage and hour class and collective action against Defendants Underwest Westside Operating Corp., Moshe Winer, Martin Taub, Avi Golan, and Elad Eforati (collectively, "Defendants") seeking the tip credit and spread-of-hours pay Defendants owed for work Plaintiffs performed in furtherance of Defendants' car wash operation from approximately April 9, 2013, until the car wash closed on June 2, 2019.

After numerous settlement discussions and two full-day mediation sessions with Hunter R. Hughes III, a mediator well-versed in handling wage and hour disputes, the parties agreed to a settlement in the gross amount of $1,219,885.73 (One Million Two Hundred Nineteen Thousand Eight Hundred and Eighty-Five Dollars and Seventy-Three Cents) as described in the Joint Stipulation of Settlement and Release submitted herewith ("Settlement Agreement" or "S.A."). The Court granted preliminary approval to the settlement, appointed Arenson, Dittmar & Karban Class Counsel, appointed Named Plaintiffs as Class Representatives, approved the notice and claims process, and set a date for a fairness hearing.

In light of this successful settlement, Plaintiffs respectfully submit this memorandum of law to support their request that the Court: (i) certify the class for settlement, pursuant to Fed. R. Civ. P. 23(e); (ii) grant final approval of the Settlement Agreement on behalf of the class; (iii) grant final approval of the settlement on behalf of the FLSA collective under 29 U.S.C. § 216(b),

as it reflects the fair and reasonable compromise of disputed issues that were reached as a result of contested litigation; (iv) award the Class Representatives their requested service awards; (v) award Class Counsel its requested fees and costs; (vi) approve payment of the settlement administrator's costs from the settlement fund; and (vii) grant such other relief that the Court deems just and proper.  Defendants do not object to the relief requested herein.

## RELEVANT BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs recited the history of this case, as well as the terms of the settlement and the form and content of the notice, in their preliminary approval motion (Dkts. 112–125) ("Preliminary Approval Motion"). Following a hearing on September 14, 2021, the Court granted preliminary approval of the settlement (as modified, Dkt. 135). Plaintiffs incorporate their brief and the accompanying documents here.

Defendants produced a class list of 163 individuals. (Declaration of Jeffrey D. Johnson, February 3, 2022 ("Johnson Dec.") ¶ 7.) The administrator mailed notice on October 22, 2021 to those individuals. That same day it also sent a WhatsApp message to the 74 individuals for whom Defendants had phone numbers. (Johnson Dec. ¶¶ 6–8.) In response, seventy-seven (77) class members have filed claims with the administrator, while none have opted-out of or objected to the settlement. (Johnson Dec. ¶¶ 11–13.)

The administrator calculated that, based on the requested costs and fees, the net settlement fund is $683,486, meaning that Class Members who have filed claims will be recovering approximately 88% of their actual damages. (Mermelstein Dec. ¶¶ 13, 17.) Of that amount, over 78% of the fund has been claimed—that is, claims have been filed that would result in $537,861.25 of payments to the class members. (Johnson Dec. ¶ 15; Mermelstein Dec. ¶ 17.)

## ARGUMENT

Given the parties' successful agreement to settle this action and the overwhelmingly positive response from the Class, Plaintiffs seek the Court's: certification of the class for settlement purposes; approval of the Settlement Agreement; award of service awards to the Class Representatives, fees and costs to Class Counsel, and costs to the administrator.

### I.   THE COURT SHOULD CERTIFY THE NYLL CLASS FOR SETTLEMENT

As part of final approval of the class action settlement, courts must certify the proposed class pursuant to Rule 23. Here, the Court should certify the class for the purposes of settlement for the same reasons addressed in Plaintiffs' Memorandum of Law in support of their motion for preliminary approval (Dkt. 113) and listed by the Court in Section III of its Order granting preliminary approval (Dkt. 135). Plaintiffs therefore request that the class be certified for settlement purposes.

### II.   FINAL APPROVAL OF THE SETTLEMENT IS APPROPRIATE BECAUSE THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

Plaintiffs request that the Court finally approve the Settlement Agreement pursuant to Fed. R. Civ. P. 23(e) and the more lenient FLSA standard. In evaluating a class action settlement under Fed. R. Civ. P. 23, courts in the Second Circuit have traditionally considered the nine *Grinnell* factors enumerated in *Detroit v. Grinnell Corp.* Since the 2018 amendment of Rule 23(e), courts also the factors specified in the amendment, while acknowledging that the Rule 23(e) factors significantly overlap with the *Grinnell* factors. Because "the standard for approval of an FLSA settlement is lower than for a Rule 23 settlement," satisfaction of the *Grinnell* and Rule 23 factor analysis will, necessarily, satisfy the standards of approval of the FLSA settlement. *Henry v. Little Mint, Inc.*, No. 12 CIV. 3996 CM, 2014 WL 2199427, at *7 (S.D.N.Y. May 23, 2014) (citations omitted).

### A.  The *Grinnell* Factors Favor Settlement

In *Detroit v. Grinnell Corp.*, the Second Circuit listed nine factors for courts to consider in evaluating whether class action settlements are fair, reasonable, and adequate: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund, given the best recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery, given all the attendant risks of litigation.  495 F.2d 448, 463 (2d Cir. 1974). All of these factors favor settlement in this case.

### 1.  Litigation Through Trial Would Be Complex, Costly, and Long (*Grinnell* Factor 1)

By settling prior to trial, Plaintiffs will avoid further expense and delay in obtaining a recovery for the class. "Most class actions are inherently complex and settlement avoids the costs, delays and multitude of other problems associated with them." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000), *aff'd sub. nom. D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001). Particularly in complex wage and hour litigation like this one, involving both federal and state statutory rights, protracted litigation is costly and burdensome, and includes motion practice and potential appeals over class certification. *See Gilliam v. Addicts Rehab. Ctr. Fund*, 2008 WL 782596, at *4 (S.D.N.Y. Mar. 24, 2008). Here, for example, the number of named parties alone would undoubtedly cause additional expense and delay should the litigation proceed. Before the case was stayed Defendants had noticed the depositions of all 14 Named Plaintiffs, while Plaintiffs, at a minimum, would have sought to depose all five defendants. (Mermelstein Dec. ¶ 8.) A trial featuring that number of parties would likewise be lengthy and

consume considerable resources of both the parties and the Court. Judging from the lack of opt-outs or objections, Class Members evidently prefer to avail themselves of the relatively prompt and efficient availability of monetary relief through settlement. Therefore, the first *Grinnell* factor weighs in favor of approval.

### 2.     The Reaction of the Class Has Been Uniformly Positive (*Grinnell* Factor 2)

"It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy." *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362-63 (S.D.N.Y. 2002); *accord Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 119 (2d Cir. 2005). The lack of class member objections may itself be taken as evidencing fairness of the settlement. *Slomovics v. All for a Dollar*, 906 F. Supp. 146, 150 (E.D.N.Y. 1995). Here, there was individualized notice sent to 163 class members. While 77 class members have made claims, no objections or requests for exclusion have been received as of this writing. Such a positive response to the settlement strongly favors judicial approval. *See*, *e.g.*, *Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 239-240 (E.D.N.Y. 2010) (with 127 opt outs and 24 objections in class of over 11 million, the court stated, "[g]iven the relatively small number of class members who opted out or objected to the Settlement, the Court finds that the reaction of the class has been overwhelmingly positive, which strongly weighs in favor of Settlement approval."). Given the emphasis courts place on the class's reaction and the uniformly positive reaction here, the second *Grinnell* factor weighs heavily in favor of settlement.

### 3.     The Parties Engaged in Sufficient Discovery to Resolve the Case Responsibly (*Grinnell* Factor 3)

On this factor, the proper question is "whether counsel had an adequate appreciation of the merits of the case before negotiating." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537 (3d Cir. 2004). "[T]he pretrial negotiations and discovery must be sufficiently adversarial that they

are not designed to justify a settlement . . . [, but] an aggressive effort to ferret out facts helpful to the prosecution of the suit." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d at 176 (citation and internal quotations omitted); *see also Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 475 (S.D.N.Y. 2013) (finding an "efficient, informal exchange of information" along with "participation in a day-long mediation" to be "sufficient discovery to weigh the strengths and weaknesses" of Plaintiffs' claims and to accurately estimate the damages at issue); *Ballinger v. Advance Magazine Publrs., Inc.*, No. 13 CIV. 4036 HBP, 2014 WL 7495092, at *2 (S.D.N.Y. Dec. 29, 2014) (granting approval where case "settled before depositions were conducted, . . . [but] both sides were well acquainted with the facts and the nature of the various internships at issue").

The discovery the parties conducted satisfies this standard. Discovery and document production included (1) Defendants' production of a sample of 5,000 pages of payroll and tip sign off documents; (2) responses to interrogatories, including Class Counsel's response to document requests and interrogatories for each of 14 named plaintiffs; (3) Class Counsel's extensive spreadsheet calculations analyzing alleged week-by-week damages over the approximately six-year class period for each of the 14 named plaintiffs. (Mermelstein Dec. ¶¶ 6–10.) This review of the records allowed Class Counsel to evaluate the strengths and weaknesses of Plaintiffs' claims. (Mermelstein Dec. ¶ 10.) The parties were well-positioned to evaluate the strength of their respective positions and potential damages recoverable. This factor favors approval. *See, e.g., Sewell v. Bovis Lend Lease, Inc.*, No. 09 CIV. 6548 RLE, 2012 WL 1320124, at *6 (S.D.N.Y. Apr. 16, 2012) (granting final approval where parties exchanged voluminous documents and plaintiffs' counsel interviewed class members).

   4.   **Plaintiffs Would Face Real Risks of Establishing Liability and Damages Were the Case to Proceed (*Grinnell* Factors 4 and 5)**

"Litigation inherently involves risks." *In re Painewebber Ltd. P'ships Litig.,* 171 F.R.D. 104, 126 (S.D.N.Y. 1997). Though Plaintiffs believe their case is strong, it is subject to risk. "If settlement has any purpose at all, it is to avoid a trial on the merits because of the uncertainty of the outcome." *In re Ira Haupt & Co.*, 304 F. Supp. 917, 934 (S.D.N.Y. 1969). In assessing the risks of liability and damages, the court "must only weigh the likelihood of success by the plaintiff class against the relief offered by the settlement." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d at 177 (internal quotations and citation omitted).

Disputed factual and legal questions regarding the validity of the tip credit claimed by Defendants present substantial risks to both sides were this litigation to proceed. The vast majority of the damages in this case were predicated on establishing the invalidity of the tip credit Defendants claimed. Defendants argued that, even if Plaintiffs were not given adequate notice under the FLSA, since Defendants met the FLSA's minimum wage requirements without the tip credit, they were not subject to the FLSA's notice requirements. (Dkt. 53.) Defendants maintained weekly "tip sign off reports" bearing Plaintiffs' signatures acknowledging receipt of a weekly tip amount sufficient to bring Plaintiffs' wages up to the New York minimum wage. Defendants argued that these constituted substantial evidence that the employee received in tips at least the amount of the allowance claimed by the employer as required by the NYLL to legally claim a tip credit. In the face of these records, Plaintiffs would have had to prove, largely through testimony, that the "tip sign off reports" were inaccurate and therefore did not constitute "substantial evidence" of compliance. While Plaintiffs also argued that managers illegally sharing in the tip pool invalidated the tip allowance, Defendants cited to caselaw where courts had found that, as a matter of law, such sharing did not invalidate the tip allowance under the NYLL. (Dkt. 53.) Moreover, even if Plaintiffs were to prevail on this legal issue, Plaintiffs

would, again, have had to rely on testimony to prove that managers took from the tip pool. Finally, Defendants also argued that, even if Plaintiffs established that a manager shared tips and that such sharing invalidated the tip allowance, damages should be limited only to weeks where Plaintiffs could establish that the manager took tips. If adopted by the Court, such a position would significantly increase the risks of establishing damages for Plaintiffs.

### 5. Establishing and Maintaining the Class Through Trial Presents Risks (*Grinnell* Factor 6)

Here again, this factor weighs in favor of granting final approval of the settlement. Defendants could argue that some of the issues raised above depend on individualized factual inquiries inappropriate for class treatment. While Plaintiffs remain confident that they could establish liability and damages on a class-wide basis, they remain realistic as to the risks and uncertainty inherent in maintaining class certification on their claims through trial.

### 6. The Uncertain Ability of Defendants to Withstand a Greater Judgment (*Grinnell* Factor 7) Favors Settlement

The corporate defendant here operated a single location car wash that closed in June 2019, making that defendant judgment proof. (Mermelstein Dec. ¶ 33.) That left the individual defendants. As discussed above, there was additional risk involved with proving liability for each individual defendant. *See Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 365 (S.D.N.Y. 2002) (weighing this factor in favor of settlement where corporate defendant's financial status was "dire" and collecting from individual defendants would depend on proving individual wrongdoing). Moreover, the ability of the individuals to withstand a significantly greater judgment was far from assured. *See Dominguez v. Galaxy Recycling Inc.*, No. CV 12-7521 (LDW), 2017 WL 2495406, at *4 (D.N.J. June 9, 2017) (weighing this factor in favor of settlement where individual was only solvent defendant with ability to pay judgment). Therefore, this factor weighs in favor of settlement.

7.   **The Settlement Fund Is Substantial in Light of the Best Possible Recovery and the Attendant Risks of Litigation (*Grinnell* Factors 8 and 9)**

The $1,219,885.73 settlement amount represents substantial value given the risks of litigation. Determining whether a settlement amount is reasonable "is not susceptible of a mathematical equation yielding a particularized sum." *In re Austrian & German Holocaust Litig.*, 80 F. Supp. 2d at 178 (quotations omitted). "Instead, 'there is a range of reasonableness . . . a range which recognized the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion.'" *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 186 (W.D.N.Y. 2005) (citations and quotation omitted). "[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Grinnell Corp.*, 495 F.2d at 455 n.2. "It is well- settled law that a cash settlement amounting to only a fraction of the potential recovery will not *per se* render the settlement inadequate or unfair." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 628 (9th Cir. 1982) (emphasis added); *see also Cagan v. Anchor Sav. Bank FSB*, No. 88 Civ. 3024, 1990 WL 73423, at *12-13 (E.D.N.Y. May 22, 1990) (approving $2.3 million class settlement where the "best possible recovery would be approximately $121 million"). Courts have found wage and hour settlement amounts to fall within the "range of reasonableness" when the amount distributed to claimants approaches their actual wage damages. *See Lizondro-Garcia v. Kefi LLC*, 300 F.R.D. 169, 173, 180 (S.D.N.Y. 2014) (finding settlement fair and reasonable where the net settlement fund covered approximately 77% of class members actual damages "because even after attorney's fees, service awards, and administrative costs, plaintiffs would receive nearly all of their actual damages"); *Lora v. To-Rise, LLC*, No. 16-CV-3604-SJB, 2020 WL 8921400, at *5 (E.D.N.Y.

June 3, 2020) (settlement was within the range of reasonableness where net settlement fund was 90.6% of actual damages); *Manley v. Midan Rest. Inc.*, No. 14 CIV. 1693 (HBP), 2016 WL 1274577, at *9 (S.D.N.Y. Mar. 30, 2016) (85% of actual damages).

Here, the settlement provides much more than a small fraction of the potential recovery. Plaintiffs' Counsel estimated that the actual damages—the amount of minimum wage, overtime, and spread-of-hours pay—owed to Plaintiffs amounted to $775,845.[1]  (Mermelstein Dec. ¶ 13.) The net settlement fund here for distribution to the class—exclusive of requested service awards, attorney's fees, litigation costs, administrative costs, and payroll taxes—is calculated as $683,486, meaning that Class Members who have filed claims will be recovering approximately **88%** of their actual damages. (Mermelstein Dec. ¶ 17; *see also* Johnson Dec. ¶ 15.) Weighing the benefits of the settlement against the available evidence and the risks associated with proceeding in the litigation discussed above—including potential collection issues—the settlement amount is reasonable.

### B.  The Settlement Satisfies Rule 23(e)

Courts approve settlement proposals that are "fair, reasonable, and adequate." Rule 23(e), as amended in 2018, instructs courts making that determination to consider whether:

**(A)** the class representatives and class counsel have adequately represented the class;
**(B)** the proposal was negotiated at arm's length;
**(C)** the relief provided for the class is adequate, taking into account:
**(i)** the costs, risks, and delay of trial and appeal;
**(ii)** the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
**(iii)** the terms of any proposed award of attorney's fees, including timing of payment; and
**(iv)** any agreement required to be identified under Rule 23(e)(3); and
**(D)** the proposal treats class members equitably relative to each other.

FRCP 23(e)(2).

---

[1] As of the initial mediation in January 2021, Plaintiffs estimated the total potential damages, including liquidated damages and interest, to be $2,027,087.23.

Based on language in the Advisory Committee Notes stating that the goal of the 2018 amendment was "not to displace any factor" of the lists in existing lists of factors used in each circuit, courts have understood the new Rule 23(e) factors "to add to rather displace, the *Grinnell* factors."[2] *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 29 (E.D.N.Y. 2019); *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 692 (S.D.N.Y. 2019). Nonetheless, courts have noted that many of the Rule 23(e) factors overlap with the *Grinnell* ones. *See id*.

The four Rule 23(e) factors are divided evenly between procedural considerations and substantive ones. *See* 4 William B. Rubenstein, Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*, (5th ed. 2011) ("Newberg") § 13.48. The procedural ones deal with adequate representation and arm's length negotiation while the substantive ones focus on adequacy of relief and intra-class equity.

1. **The Settlement Is Procedurally Fair Because the Class Representatives and Class Counsel Have Adequately Represented the Class and the Settlement Was Negotiated at Arm's Length**

In considering whether the class representatives and class counsel have adequately represented the class, the Advisory Committee Notes direct courts to look to the nature and amount of discovery and the actual outcomes in other cases. *See* 4 Newberg § 13.49. Plaintiffs demonstrated the sufficiency of discovery here in their discussion of the third *Grinnell* factor above. As to the actual outcomes of cases, Plaintiffs have demonstrated in their discussion of the

---

[2] Plaintiffs are unaware of a court that has explicitly attempted to square that understanding with subsequent sections of the Notes that arguably belie it, including the next paragraph which discusses problems with the existing "lengthy list of factors" that make up such tests and concludes, "The sheer number of factors can distract both the court and the parties from the central concerns that bear on review under Rule 23(e)(2)." The next paragraph says that the amendment "directs the parties to present the settlement to the court in terms of a shorter list of core concerns."

eighth and ninth *Grinnell* factors above that the outcome here compares favorably with those in other similar wage and cases.[3]

Courts consistently presume that a settlement agreement is fair if it was the "product of arm's length negotiations," contains no "obvious deficiencies," and was not the product of "fraud or collusion." *Ray*, 2020 WL 5796203 (S.D.N.Y. Sept. 29, 2020); *Silver*, 2013 WL 208918, at *1 (S.D.N.Y. Jan. 4, 2013); *Clark*, 2009 WL 6615729 (S.D.N.Y. Nov. 27, 2009); *In Re Med. X-ray Film Antitrust Litig*, 1997 WL 33320580, at *6 (E.D.N.Y. Dec. 26, 1997)(settlement should be the "result of serious, informed and non-collusive negotiations"); *Lizondro-Garcia*, 300 F.R.D. 169 (S.D.N.Y. 2014) (balancing these factors and concluding that the agreement could be preliminarily approved). "The involvement of…an experienced and well-known employment and class action mediator, is also a strong indicator of procedural fairness." *Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 618 (S.D.N.Y. 2012) (citing cases); *see also Capsolas v. Pasta Res. Inc.*, 2012 WL 4760910, at *4 (S.D.N.Y. Oct. 5, 2012) ("these arms-length negotiations involved counsel and a mediator well-versed in wage and hour law, raising a presumption that the settlement achieved meets the requirements of due process").

Here, the efforts by Counsel, Plaintiffs, and the mediator, over the course of several months resulted in this Settlement Agreement that Plaintiffs' Counsel believes is in the best interests of the class and the collective.  Hunter R. Hughes III, a well-known employment and class action mediator, well-versed in wage and hour law, mediated both full-day sessions, further evincing the propriety of the settlement.  As such, Plaintiffs submit that the proffered settlement is the "result

---

[3] For an outcome in this District that illustrates the pitfalls of proceeding against an individual defendant when the business has closed, Plaintiffs direct the Court's attention to *Murphy v. Lajaunie*, 13-CV-6503 (RJS)(SN), a case commenced in 2012 and last month dismissed without prejudice with the court's approval due to the insolvency of the corporate defendants and the financial condition of the individual defendant. (Dkt. 375–76.)

of serious, informed and non-collusive negotiations," has the earmarks of an arm's length negotiation, and should be approved. *Lizondro-Garcia v. Kefi LLC*, 300 F.R.D. 169 (S.D.N.Y. 2014).

        **2.**       **The Settlement is Substantively Fair Because It Provides Adequate Relief Considering the Costs and Risks of Continued Litigation, Equitable and Effective Distribution Method, and Timing and Amount of Requested Fees**

The last two Rule 23(e) factors focus on the substantive issues of the adequacy of class relief considering four sub-factors and the equity of treatment of class members. As most of *Grinnell* factors, addressed above, focus on the costs and risks of continued litigation, Plaintiffs will not repeat that analysis here. Plaintiffs also separately address the amount of requested fees below. Regarding the timing of the fees, per Sections 2.13 and 2.16 of the Settlement Agreement, the fees are to be distributed simultaneously with the mailing of settlement checks to the class. That leaves for discussion here the issues of intra-class equity and effectiveness of the distribution.

The settlement and claims process here—which the court previously approved in Section VI of its Modified Order (Dkt. 135)—was designed to allocate money to class members on an equitable, pro-rata basis. Each class member with a valid claim will receive a payment based upon the number of weeks they worked during the relevant period. The allocation formula used a points system that provided different weights to claims based on the job of the employee and time period of the weeks worked. (Dkt. 127-7.) Weeks worked between April 9, 2013 and December 31, 2014 were given additional weight due to the additional spread-of-hours claims during that period. The rest of the claims were based on the alleged invalidity of tip credit claimed by Defendants. Because cashiers did not receive tips, their weeks were weighted to the account for the absence of tip credit claims. (Mermelstein Dec. ¶ 18.) The class members were assumed to have worked 54 hours per week, but the claim form provided a challenge mechanism to any who believed they had worked

more. (Johnson Dec. Ex. 1, 8.) Every class member who had previously filed an opt-in was deemed to have filed a claim unless they opted-out. The claim forms required minimal information and were easy to understand. Toll free numbers were established by the settlement administrator to provide assistance to those who needed it. (Johnson Dec. ¶ 9.) Class Counsel provided such assistance, as well.

As for the distribution's effectiveness, the results speak for themselves: class members filed claims for $537,861.26 of the $683,846 fund available to be claimed, a claim rate of 78.7%. If the settlement is approved, then Defendants will fund the settlement account in an amount a little more than 88% of the gross settlement amount. (*See* Johnson Dec. ¶ 15.)

Therefore, because the Settlement is fair, reasonable and adequate considering both the Rule 23(e) factors, as well as the *Grinnell* ones, it should be approved.

## C. Final Approval of the Settlement Is Also Appropriate Under the FLSA Standard

Prior to preliminary approval, the Court already determined that conditional certification of the FLSA claims, pursuant to 29 U.S.C. § 216(b) was appropriate and authorized distribution of a notice.  [See Decision and Order entered on Feb. 18, 2020, Dkt. 68]. Final approval is appropriate, as well.

A FLSA collective action settlement, like a proposed class settlement, is not effective unless judicially approved.  *Wolinsky v. Scholastic Inc.,* 900 F.Supp.2d 332, 335 (S.D.N.Y.2012) ("[A]n employee may not waive or otherwise settle an FLSA claim . . . for less than the full statutory damages unless the settlement is . . . made pursuant to a judicially supervised stipulated settlement."); *Beckman v. KeyBank, N.A.,* 293 F.R.D. 467, 476 (S.D.N.Y.2013).

Unlike the settlement of a class action, however, the settlement of a collective action does not implicate the same Due Process concerns, because under the FLSA, "parties may elect to opt

in but a failure to do so does not prevent them from bringing their own suits at a later date." *Lizondro-Garcia v. Kefi LLC*, 300 F.R.D. 169 (S.D.N.Y. 2014) *citing Beckman v. KeyBank, N.A., supra,* 293 F.R.D. at 476.

Accordingly, a FLSA settlement is examined with less scrutiny than a class action settlement. Courts ask whether the proposed settlement reflects a fair and reasonable compromise of disputed issues that were reached because of contested litigation. *See Wolinsky v. Scholastic Inc., supra,* 900 F.Supp.2d at 335.

Courts routinely approve settlements under the FLSA standard where the settlement meets the more rigorous class action standard. *See, e.g., Lizondro-Garcia v. Kefi LLC*, 300 F.R.D. 169 (S.D.N.Y. 2014). Thus, for the reasons explained above, this settlement represents a fair and reasonable compromise of the disputed issues, reached as a result of contested litigation, and Plaintiffs request that the settlement be approved under the more lenient FLSA standard, as well as the Rule 23 approval standard.

### III.    PLAINTIFFS' REQUESTS FOR SERVICE PAYMENTS ARE REASONABLE AND SHOULD BE APPROVED

Courts routinely approve service payments in wage and hour class and collective actions. *See, e.g., Frank*, 228 F.R.D. at 187 ("[S]uch awards are particularly appropriate in the employment context. In employment litigation, the plaintiff is often a former or current employee of the defendant, and thus, by lending his name to the litigation, he has, for the benefit of the class as a whole, undertaken the risk of adverse actions by the employer or co-workers."). "Awards on an individualized basis have generally ranged from $2,500 to $85,000, and empirical studies have shown that, in recent years, the median incentive award per plaintiff is approximately $5,000 and the mean incentive award is approximately $12,000." *In re LIBOR-*

*Based Fin. Instruments Antitrust Litig.*, 2018 WL 3863445, at *2 (S.D.N.Y. Aug. 14, 2018) (cleaned up).

Without opposition, Plaintiffs seek service payments of $5,000 to each of the fourteen original Named Plaintiffs. The request is reasonable given the contributions these individuals made to advance the prosecution and resolution of this case: for their willingness to serve the Class, the service they rendered, risks they bore, and opportunities sacrificed to ensure a favorable class settlement. Crucially, the Service Awardees assisted Class Counsel's investigation and prosecution of the claims by providing detailed factual information regarding their duties and responsibilities, the hours that they worked, and the duties of other class members. They responded to document requests and communicated regularly with Class Counsel to assist with their investigation of the facts. Further, the Service Awardees helped Class Counsel prepare for both mediations and were available to communicate with Class Counsel concerning Defendants' arguments. These Service Awardees played crucial roles in bringing justice to those who otherwise would be hidden from judicial scrutiny. *Velez v. Majik Cleaning Serv.*, 2007 WL 7232783, at *7 (S.D.N.Y June 25, 2007) ("[I]n employment litigation, the plaintiff is often a former or current employee of the defendant, and thus, by lending his name to the litigation, he has, for the benefit of the class as a whole, undertaken the risk of adverse actions by the employer or co-workers."); *In re American Int'l. Grp. Inc. Sec. Litig.*, 2012 WL 345509 (S.D.N.Y. Feb. 2, 2012); *DeLeon v. Wells Fargo Bank, N.A.*, 2015 WL 2255394 (S.D.N.Y. May 11, 2015); *Parker v. Jekyll & Hyde Ent. Holdings, L.L.C.*, 2010 WL 532960 (S.D.N.Y. Feb. 9, 2010). In examining the reasonableness of a requested service payment, courts consider: (A) the existence of special circumstances, including the personal risk incurred by the service awardees; (B) the time and effort expended by the service awardees in

assisting the prosecution of the litigation; and (C) the ultimate recovery in vindicating statutory rights. *Frank*, 228 F.R.D. at 187.

### A.  Class Representatives Assumed Significant Risk

In assessing the reasonableness of service awards, courts consider the risks assumed in serving the interests of the class. *See Frank*, 228 F.R.D. at 187; *Parker*, 2010 WL 532960, at *1 (S.D.N.Y. Feb. 9, 2010); ("Enhancement awards for class representatives serve the dual functions of recognizing the risks incurred by named plaintiffs and compensating them for their additional efforts."). In the employment context, where workers are often blacklisted if they are considered "trouble makers," plaintiffs who sue their employers are particularly vulnerable to retaliation. *See Frank*, 228 F.R.D. at 187-88; *see also Velez*, 2007 2007 WL 7232783, at *7 (observing that the plaintiffs "exposed themselves to the prospect of having adverse actions taken against them by their former employer and former co-workers").

Even where there is not a record of actual retaliation, plaintiffs merit recognition for assuming the risk of retaliation for the sake of absent class members. *See Sewell*, 2012 WL 1320124, at *14 ("Plaintiffs litigating cases in an employment context face the risk of subjecting themselves to adverse actions by their employer."); *Frank*, 228 F.R.D. at 187-88 ("Although this Court has no reason to believe that Kodak has or will take retaliatory action towards either Frank or any of the plaintiffs in this case, the fear of adverse consequences or lost opportunities cannot be dismissed as insincere or unfounded.").

Here, besides facing significant risks due to the nature of the industry in which they work, those Named Plaintiffs still working at the car wash when Plaintiffs filed suit risked retaliation and losing their job; moreover, when the car wash closed Defendants would not help them seek work at other car washes as long as they kept their names on the lawsuit.  (Dec. Lesly

Pierre ¶ 16 (Dkt. 116); Dec. Sualio Kamagate ¶ 15 (Dkt. 117); Dec. Jean Hilaire ¶ 16 (Dkt. 118); Dec. Fousseini Camara ¶ 15 (Dkt. 119); Dec. Edgar Espinoza ¶ 17 (Dkt. 120); Dec. Angel Sandoval ¶ 16 (Dkt. 125).)  By way of example of the risks involved, Edgar Espinoza was even pressured to leave the case by his employer, and he refused.  (Dec. Edgar Espinoza, ¶ 17.) Even Named Plaintiffs who no longer worked for Defendants when they joined the lawsuit risked retaliation from their current employers and put their ability to secure future employment at risk as well. *See Sewell*, 2012 WL 1320124, at *14 ("[F]ormer employees . . . fac[ed] potential risks of being blacklisted as 'problem' employees."); *Parker*, 2010 WL 532960, at *1 ("[F]ormer employees put in jeopardy their ability to depend on the employer for references in connection with future employment."). Service awards "provide an incentive to seek enforcement of the law despite these dangers." *Parker*, 2010 WL 532960, at *1.

### B.  Class Representatives Expended Significant Time and Effort

The Court should grant the requested service awards based on the significant work that the Class Representatives undertook on behalf of the class. Courts recognize the important factual knowledge that plaintiffs bring to employment class actions, including information about employer policies and practices that affect wages. *See Frank*, 228 F.R.D. at 187 (recognizing the important role that plaintiffs play as the "primary source of information concerning the claims[,]" including by responding to counsel's questions and reviewing documents). Here, the Class Representatives contributed significant time and efforts to the case as they participated in multiple, lengthy, in-person interviews and phone conferences with Plaintiffs' counsel over the span of two years, signed declarations in support of Plaintiffs' motion for sending notice to the collective, provided pay-related documents to counsel, reviewed pleadings and documents provided by defense counsel and discussed their contents with Plaintiffs' counsel, communicated

24

about the case with class members, and kept in contact with Plaintiffs' counsel about the status

of the case.  (Pierre Dec. ¶¶ 13 – 14; Kamagate Dec. ¶ 13; Hilaire Dec. ¶ 13; Camara Dec. ¶ 12;

Espinoza Dec. ¶ 14;Dec. Braulio Matamores Flores ¶ 14 (Dkt. 121); Dec. Jean Vertus ¶ 13 (Dkt.

No. 122); Dec. Jean Fresnel ¶ 12 (Dkt. 123); Dec. Jean Morose ¶ 14 (Dkt. No. 124); Sandoval

Dec. ¶ 13.) This time and effort supports the requested service awards. *See Sewell*, 2012 WL

1320124, at *15 (granting service awards of $15,000 and 10,000 to named plaintiffs where they

"provided detailed factual information to class counsel for the prosecution of their claims and

made themselves available regularly for any necessary communications with counsel").

### C.  The Ultimate Recovery Supports the Requested Payments

The requested service awards amount to less than 6% of the total recovery, which is a

reasonable percentage. *See Lora v. To-Rise, LLC*, No. 16-CV-3604-SJB, 2020 WL 8921400, at

*7, n.3 (E.D.N.Y. June 3, 2020) (granting service awards in FLSA/NYLL hybrid case of $15,000

to the lead plaintiff and $10,000 to each other named plaintiff, for a total of $75,000 comprising

nearly 12% of the gross settlement amount); *Parker*, 2010 WL 532960, at *2 (finding that

service awards totaling 11% of the total recovery are reasonable "given the value of the

representatives' participation and the likelihood that class members who submit claims will still

receive significant financial awards").

### IV.  PLAINTIFFS' REQUEST FOR ATTORNEY'S FEES AND COSTS IS REASONABLE AND SHOULD BE APPROVED

#### A.  The Percentage Method Is the Preferred Method in the Second Circuit for Awarding Attorneys' Fees in a Common Fund Case

In class action lawsuits to recover wages, "public policy favors [a common fund] award"

of attorneys' fees. *Frank*, 228 F.R.D. at 189. Although there are two ways to compensate

attorneys for successful prosecution of statutory claims – the lodestar method and the percentage

of the fund method – in common fund cases like this one, courts in this Circuit prefer to award

fees as a percentage of the fund. *Dupler*, 705 F. Supp. 2d at 242 (*quoting Wal-Mart Stores*, *Inc. v. Visa USA Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) ("'The trend in this Circuit is toward the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful incentive for efficient prosecution and early resolution of litigation'")).

### B.  Plaintiffs' Request for Attorneys' Fees Is Reasonable

The Second Circuit has held that courts should be guided by the so-called "*Goldberger* factors" in determining a reasonable common fund fee, including: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation ...; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Goldberger*, 209 F.3d at 50 (citing *In re Union Carbide Corp. Consumer Products Bus. Sec. Litig.*, 724 F. Supp. 160, 163 (S.D.N.Y. 1989)). Here, all the *Goldberger* factors weigh in favor of awarding Class Counsel their requested fees.

### 1.  Class Counsel has expended significant time and effort on this case

Class counsel made significant efforts to achieve the settlement in this action. Class Counsel met with each of the 14 named plaintiffs on multiple occasions to probe the facts underlying their claims, including the hours worked and the pay received by each of them. (Mermelstein Dec. ¶ 7.)  Plaintiffs' counsel questioned each of the named Plaintiffs extensively about the information they were provided concerning the tips they received and about whether their managers took tips. (*Id.*) On April 9, 2019, the Named Plaintiffs filed a class and collective complaint. (Dkt. 1.) Plaintiffs subsequently filed a motion for conditional certification pursuant to 29 U.S.C § 216(b), supported by declarations from four Named Plaintiffs. (Dkt. 41–46.) The Court granted the motion (Dkt. 68) and Notices and Consent to Join forms in English, Spanish and French

26

were mailed to 80 workers. (Mermelstein Dec. ¶ 11.) Class Counsel met with approximately 30 of

the 39 workers who had timely filed consents to join the collective. (*Id*.)

Before engaging in mediation, the parties engaged in sample discovery, during which

Defendants produced more than 5,000 pages of documents and responded to Plaintiffs'

interrogatories so that Plaintiffs could analyze the Class Members' alleged damages. (Mermelstein

Dec. ¶ 6.) Class Counsel also responded to document requests and interrogatories for each of 14

named plaintiffs, and reviewed and produced hundreds of documents to defendants. (*Id*. ¶ 8.)

After thoroughly scrutinizing the sample weeks and discussing them with Defense

Counsel, Plaintiffs' Counsel was able to approximate the actual damages owed to Plaintiffs and

used them to produce extensive spreadsheet calculations analyzing alleged week-by-week

damages over the approximately six-year class period for each of the 14 named plaintiffs.

(Mermelstein Dec. ¶ 10.) Besides the intensive factual investigation, the Parties researched and

briefed several legal issues, including the satisfaction of tip notice requirements under the FLSA

and NYLL. This review of the records and the law allowed Plaintiffs' counsel to evaluate the

strengths and weaknesses of Plaintiffs' claims. (*Id*.)

On January 13, 2021, the parties participated in their first virtual, full-day mediation with

Hunter R. Hughes III, one of the country's preeminent mediators.  (Mermelstein Dec. ¶ 12.) In

advance of the first mediation session, the parties prepared extensive mediation briefs that they

submitted to Mr. Hughes. (*Id*.) During the first mediation session, the parties discussed liability

and argued the strengths and weaknesses of their respective positions.  (*Id*.) Though the parties

had not reached an agreement by the end of the session, they agreed to continue their negotiations

in good faith.  After successfully participating in further telephonic settlement discussions, on

April 6, 2021, the parties attended a second, virtual, full-day mediation, again mediated by Mr.

Hughes. (*Id*.) While the parties still had not agreed by the close of the session, the parties and the mediator carried out follow-up efforts over the following week. (*Id*.) After even further negotiations, and after Mr. Hughes issued a formal mediator's proposal on April 22, 2021, on April 30, 2021, the parties agreed to settle all claims for $1,219,885.73 (One Million Two Hundred Nineteen Thousand Eight Hundred and Eighty-Five Dollars and Seventy-Three Cents). The parties proceeded to negotiate the details of the settlement over the course of several months. (*Id*.) On August 9, 2021, Plaintiffs filed a Motion for Preliminary Approval, in support of which they submitted declarations from 10 of the 14 Named Plaintiffs. (Dkt. 112–125.)

In prosecuting and settling this case, Class Counsel expended approximately 785 hours of attorney time, resulting in a lodestar of $368,427. (Mermelstein Dec. ¶ 29, Ex. 1.) These hours are reasonable for a case like this one and were compiled from contemporaneous time records maintained by each attorney participating in the case. (*Id*.) The requested fee is not based solely on time and effort already expended; rather, it is also meant to compensate Class Counsel for time that will be spent administering the settlement in the future. Besides the work performed to date, Class Counsel will have to perform additional work to effectuate the administration of the settlement. (Mermelstein Dec. ¶ 30.) *See, e.g.*, *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 482 (S.D.N.Y. 2013) ("Class Counsel is often called upon to perform work after the final approval hearing, including answering class member questions, answering questions from the claims administrator, and negotiating and sometimes litigating disagreements with defendants about administering the settlement and distributing the fund.") *Tiro v. Pub. House Invs., LLC*, No. 11 CIV. 7679 CM, 2013 WL 4830949, at *13 (S.D.N.Y. Sept. 10, 2013) (fee award is also meant to compensate Class Counsel for future settlement administration). In Class Counsel's experience, administering class settlements of this nature and size requires a substantial and ongoing

commitment. (Mermelstein Dec. ¶ 30.) Since the notice was mailed, Class Counsel have responded to numerous inquires about the settlement. (*Id*.) As is common in wage and hour class actions, Class Counsel expect to respond to more Class Member inquiries after final approval, especially after checks are issued to Class Members. (*Id*.) As such, this factor weighs in favor of Class Counsel's requested award.

### 2. The litigation was large and complex

This case involved over 160 Class Members and complex legal and factual questions. *See Goldberger*, 209 F.3d. at 50 (assessing the magnitude and complexity of the litigation as one of the criteria for determining a reasonable fee award). "FLSA claims typically involve complex mixed questions of fact and law… These statutory questions must be resolved in light of volumes of legislative history and over [eight] decades of legal interpretation and administrative rulings." *Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 743 (1981). "Among FLSA cases, the most complex type is the 'hybrid' action brought here, where state wage and hour violations are brought as an 'opt out' class action pursuant to Rule 23 in the same action as the FLSA 'opt in' collective action pursuant to 29 U.S.C. § 216(b)." *Sukhnandan v. Royal Health Care of Long Island LLC*, No. 12CV4216 RLE, 2014 WL 3778173, at *10 (S.D.N.Y. July 31, 2014). "Justice is served and consistency and efficiency are achieved by having the litigation in one forum because the same set of operative facts are being applied and analyzed under both statutory frameworks." *Id*.; *see also Ansoumana*, 201 F.R.D. at 89.

Moreover, Plaintiffs' claims hinged on several fact intensive inquires – (i) whether Defendants' tip sign-off reports accurately reflected the amount of tips Plaintiffs received; (ii) whether Defendants had a policy of allowing their managers to partake of the tip pool; and (iii) whether Defendants provided notice to Plaintiffs regarding the tip credit they were taking. As discussed above (regarding *Grinnell* factors 4 and 5), the claims also depended on a favorable

resolution of certain legal issues, some of which had split courts in this circuit. Although Class Counsel believes that Plaintiffs ultimately would have prevailed, these issues nonetheless presented considerable risk and support approval of the requested fees. *See Frank*, 228 F.R.D. at 189 (mixed questions of fact and law supported court's award of attorneys' fees representing approximately 40% of the common fund). As such, this factor weighs in favor of Class Counsel's requested award.

### 3.   Class Counsel took on a large amount of risk in prosecuting this case

Uncertainty that an ultimate recovery will be obtained is highly relevant in determining the reasonableness of an award. *Grinnell*, 495 F.2d. at 470-71. "[D]espite the most vigorous and competent of efforts, success is never guaranteed." *Id.* at 471. "No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success." *Id.* at 470. "Risk should be considered 'as of when the case is filed.'" *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d at 351 (quoting *Goldberger*, 209 F.3d at 55).

Class and collective wage and hour cases of this type are, by their very nature, complicated and time-consuming. Any lawyer undertaking representation of large numbers of affected employees in such actions inevitably must be prepared to make a tremendous investment of time, energy, and resources. Due also to the contingent nature of the customary fee arrangement, lawyers are asked to be prepared to make this investment with the very real possibility of an unsuccessful outcome and no fee of any kind. Class Counsel stood to gain nothing in the event the case was unsuccessful. (Mermelstein Dec. ¶ 31.) This assumption of risk supports the requested fee award. *See*, *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d at 351 (fact that "the law was unsettled on several issues relating to liability and/or damages" supported fee request).

### 4. The Class Members are represented by Class Counsel with significant experience in wage and hour litigation

"To determine the 'quality of the representation,' courts review, among other things, the recovery obtained and the backgrounds of the lawyers involved in the lawsuit." *Taft v. Ackermans*, 2007 WL 414493, at \*10 (S.D.N.Y. Jan. 31, 2007). The recovery obtained in this action was substantial. Defendants have agreed to pay $1,219,885.73 to settle this litigation. Moreover, each Class Member that filed a valid claim will receive **88 %** of their wage claims *after* fees, costs, expenses, and service awards. Weighing the benefits of the settlement against the risks associated with proceeding in the litigation, the settlement is considerable.

The quality of representation also supports Class Counsel's request. Class Counsel has represented Plaintiffs in this suit from its inception and has performed substantial work and expended significant resources identifying, investigating, prosecuting, and settling the claims. Critically, Plaintiffs' Counsel has substantial experience prosecuting and settling wage and hour class actions. Courts have repeatedly found Class Counsel to be adequate class counsel in wage and hour class actions. Class Counsel are experienced litigators who have successfully represented classes in numerous class actions and have considerable experience in labor law cases identical to those at bar. Examples of some of the employment cases in which Arenson Dittmar & Karban have represented multiple plaintiffs include *Lora v. J. V. Car Wash, LTC.*, 2015 WL 4496847 (S.D.N.Y. July 24, 2015), *report and recommendation adopted sub nom. Lora v. J.V. Car Wash, Ltd.*, 2015 WL 7302755 (S.D.N.Y. Nov. 18, 2015) ("Plaintiffs [C]ounsel [Arenson, Dittmar & Karban] are highly experienced, in general and as employment litigators. Arenson, a graduate of Columbia Law School, has practiced for twenty-eight years. For the past twenty years, his practice has 'focused almost exclusively' on litigating employment cases, including numerous wage and hour disputes"); *see generally Sawadogo v. Zap Lube & Car Wash, Inc.*, No. CV 20-

1196(SDW)(LDW), 2020 WL 6689826 (D.N.J. Nov. 13, 2020); *Sandoval, et al. v. Galaxy General Contracting Corp., et al.*, No. 10-CV-5771 (PGG)(S.D.N.Y. 2013); *Mirabal v. Caribbean Car Wash, Inc.* No. 19-cv-16608-MCA-ESK (D.N.J. May 24, 2021); *Gutierrez v. Tryax Realty Mgmt., Inc.*, 2020 WL 777190 (S.D.N.Y. Feb. 18, 2020). (Mermelstein Dec. ¶ 25.)

Moreover, Plaintiffs' Counsel served as lead counsel for 150 Hispanic workers in a New Jersey state court action involving allegations of widespread sexual, racial and national origin harassment and discrimination against an internationally-known Fortune 100 company, which was the largest sexual and racial harassment case ever litigated in the United States without government involvement; serving as lead counsel for 23 Hispanic and Haitian workers in a New Jersey state court action involving allegations of a sexually and racially hostile work environment, as well as retaliation; and serving as lead counsel for 27 Hispanic workers in a New Jersey state court action involving allegations of discrimination and harassment based on race, national origin and sex. (Mermelstein Dec. ¶ 26.)

Defendant was represented by Stephen D. Hans & Associates, a management-side law firm specializing in employment and labor law. "The quality of opposing counsel is also important in evaluating the quality of Class Counsel's work," and Defendants' counsel vigorously defended them by raising serious arguments that would have presented a challenge to Plaintiffs had litigation proceeded. (Dkt. 53.) *See Tiro*, 2013 WL 4830949, at *14 (quoting *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 467 (S.D.N.Y. 2004)). This factor weighs in favor of the requested fees.

### 5.   Courts in this Circuit have awarded similar requests for attorneys' fees

Class Counsel's request for a one-third fee is "consistent with the norms of class litigation in this circuit." *Bryant v. Potbelly Sandwich Works, LLC*, No. 117CV07638CMHBP, 2020 WL 563804, at *6 (S.D.N.Y. Feb. 4, 2020); *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467,

477 (S.D.N.Y. 2013) (same); *see also Lora v. To-Rise, LLC*, No. 16-CV-3604-SJB, 2020 WL
8921400, at *6 (E.D.N.Y. June 3, 2020) (approving the requested one-third fee in FLSA/NYLL
case and finding it "in line with what courts have approved in other fund-based FLSA settlement
agreements"). "'In class settlement funds like this one, a one-third award of the settlement
proceeds [for attorneys' fees] is considered typical and reasonable . . . because "[t]he attorneys'
fees requested were entirely contingent upon success. Class Counsel risked time and effort and
advanced costs and expenses, with no ultimate guarantee of compensation."' *Knapp v. Badger
Techs., Inc*., 2015 WL 3745303, at *6 (W.D.N.Y. June 15, 2015) (quotations omitted). Such an
approach is consistent with a leading empirical study which demonstrated that 33% is the median
fee awarded in FLSA cases. *See* Theodore Eisenberg et al., *Attorneys' Fees in Class Actions:
2009-2013*, 92 N.Y.U. L. Rev. 937, 952 (2017).

### 6.   Public policy considerations favor the fee requested

Public policy supports the requested fee award because the award "properly balances the
policy goal of encouraging counsel to pursue meritorious actions while protecting against
excessive fees." *Dupler*, 705 F. Supp. 2d at 244. Where relatively small claims can only be
prosecuted through aggregate litigation, and where wage and hour abuses would go without
remedy because attorneys would be unwilling to take on the risk, "[a]dequate compensation for
attorneys who protect those rights by taking on such litigation furthers the remedial purpose of
those statutes." *Bryant*, 2020 WL 563804, at *7; *Johnson v. Brennan*, 2011 WL 4357376, at *19
(S.D.N.Y. Sept. 16, 2011).

### 7.   The lodestar cross-check further supports an award to Class Counsel of one-third of the settlement fund

Finally, the requested fee is also supported by the lodestar cross-check. "[T]he trend in
the Second Circuit has been to apply the percentage method and loosely use the lodestar method

as a baseline or cross check." *Tiro*, 2013 U.S. Dist. LEXIS 129258, at *46 (citation omitted). The lodestar analysis is performed by multiplying the number of hours reasonably expended on a client's case by a reasonable hourly billing rate for such services. *See Johnson*, 2011 U.S. Dist. LEXIS 105775, at *58 (citation omitted). "[W]here [the lodestar method is] used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court. Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case." *Goldberger v. Integrated Res.*, 209 F.3d 43, 50 (2d Cir. 2000). Courts in this Circuit regularly award lodestar multipliers from two to six times lodestar with some courts approving fee requests that are "up to eight times the lodestar, and in some cases, even higher…." *Beckman*, 293 F.R.D. at 477 (fee of 6.3 times lodestar in overtime class action approved). *See also*, *e.g.*, *Wal-Mart*, 396 F.3d at 123 (3.5 multiplier deemed reasonable, citing cases involving multipliers between 1.35 and 4.5). An empirical study in the leading class action treatise found the mean multiplier in Second Circuit Cases from 2006–2011 to be 1.52 and the nationwide mean multiplier in wage and hour cases during that same period to be 1.51. 5 Newberg § 15:89 tbls.3, 4 (5th ed.) (Westlaw 2018).

For the purposes of calculating the lodestar, Class Counsel uses a rate of $700 per hour for the partner, Steven Arenson, who expended 305.6 hours on the case; $400 for the senior associate, Avi Mermelstein, who spent 104.13 hours on the case; $350 for the associate Elyse Patterson, who spent 190.3 hours on the case; and $250 per hour for Tenzing Mingmar, a junior associate, who spent 185 hours on the case. (Mermelstein Dec. ¶ 29.) The resulting lodestar is $368,427. (*Id*.) To calculate the lodestar multiplier, the fees requested as a percentage of the fund ($406,628) are divided by the lodestar which yields a requested multiplier of 1.10, on the low end

of the spectrum of approved multipliers in this Circuit and for these types of cases as discussed above.

In addition to the time already spent in this action, Class Counsel anticipates that it will have to perform work after the final approval hearing, including answering additional calls from Class Members, working with the Settlement Administrator to answer class member questions and ensuring that the Settlement Amount is administered in accordance with the Settlement Agreement. (Mermelstein Dec. ¶ 30.) This additional time also supports Class Counsel's lodestar multiplier and fee request. *See Clark v. Ecolab Inc.*, 2010 WL 1948198, at *9 (S.D.N.Y. May 11, 2010) (holding fee request supported by fact that it would compensate class counsel not only "for time and effort already expended," but also "for time that they will be required to spend administering the settlement going forward").

### C.  The Court Should Approve Litigation and Mediation Costs

"In a certified class action, the court may award reasonable ... nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). Courts in this District have held that, generally, "counsel is entitled to reimbursement from the common fund for reasonable litigation expenses." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 CIV. 5450, 2018 WL 3863445, at *1 (S.D.N.Y. Aug. 14, 2018) (cleaned up); see also *In re Indep. Energy Holdings Pub. Ltd. Co. Sec. Litig.*, 302 F. Supp. 2d 180, 183 n.3 (S.D.N.Y. 2003) ("Attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were incidental and necessary to the representation of those clients"). "Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course." *In re LIBOR*, 2018 WL 3863445, at *1 (cleaned up).

Here, Class Counsel incurred $13,576.13 in out-of-pocket costs in litigating this matter. (Mermelstein Dec. ¶ 32.) No class member objected to Class Counsel recouping their costs from the settlement fund, and the notice informed class members that the costs could be as high as $22,500. (Johnson Dec. ¶ 13, Ex. 1, 5.) Accordingly, Class Counsel respectfully requests to be awarded such costs. The costs were reasonable and incurred in the prosecution of this matter. They include expenses such as filing fees, postage, travel, translation and interpretation costs to ensure clear communication between Named Plaintiffs, Class Members, and Class Counsel, two mediations and a third resort to the mediator after acceptance of the mediator's proposal to deal with remaining open issues. (Mermelstein Dec. ¶ 32.) The expenses were incurred to benefit the Class Members, and Class Counsel may therefore be reimbursed for them.

## V.   THE COURT SHOULD APPROVE THE PAYMENT OF ADMINISTRATIVE COSTS FROM THE SETTLEMENT FUND

After sending requests for bids to three settlement administrators, the parties mutually selected CAC Services Group, LLC ("CAC") to act as settlement administrator, as it had submitted the lowest bid. (S.A. § 1.2.) CAC has dutifully complied with its role as the administrator and will fulfill its duties in distributing the final settlement payments. CAC estimates its costs will be $15,357.81 upon completing the settlement distribution. (Johnson Dec. ¶ 15.) Therefore, Plaintiffs respectfully request that the Court order that CAC shall be paid from the Settlement Fund for its actual fees and costs in an amount not to exceed the $15,000 estimate for their services which Class Counsel finds reasonable. (Mermelstein Dec. ¶ 34.)

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request this Court grant Plaintiffs' Unopposed Motion for Final Approval of Settlement, for Award of Attorneys' Fees and Expenses, for Approval of Service Payments to the Representative Plaintiffs and for Payment of the

Settlement Administrator's Costs and Expenses, and enter the Proposed Final Order and Judgment submitted contemporaneously with this memorandum.

Dated: February 4, 2022
      New York, New York

                                    Respectfully submitted,

                                    *Avi Mermelstein*

                                    _____

                                    Avi Mermelstein